Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/01/2025 01:07 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ERIC L. RAMOS, APPELLANT.

___ N.W.3d ___

Filed July 25, 2025.    No. S-24-087.

1.  **Constitutional Law: Speedy Trial: Appeal and Error.** The standard of review appellate courts apply for constitutional speedy trial claims mirrors the standard of review appellate courts apply in statutory speedy trial cases: factual determinations relevant to the claim are reviewed for clear error while legal determinations are reviewed de novo.

2.  **Constitutional Law: Speedy Trial.** The same standards apply to a speedy trial analysis under both U.S. Const. amend. VI and Neb. Const. art. I, § 11.

3.  **Juries: Discrimination: Prosecuting Attorneys: Appeal and Error.** An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory.

4.  **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion.

5.  **Criminal Law: Motions for Continuance: Appeal and Error.** A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.

6.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

7.  **Trial: Evidence: Prosecuting Attorneys: Due Process.** The nondisclosure by the prosecution of material evidence favorable to the defendant,

requested by the defendant, violates due process, irrespective of the good faith or bad faith of the prosecution. But due process is not violated where the evidence is disclosed during trial.

 8. **Motions for Continuance: Appeal and Error.** A court does not abuse its discretion in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice because of that denial.

 9. **Motions for Mistrial: Proof: Appeal and Error.** To prove error predicated on the failure to grant a mistrial, the defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

10. **Motions for New Trial: Appeal and Error.** The standard of review for a trial court's denial of a motion for new trial after an evidentiary hearing is whether the trial court abused its discretion in denying the motion.

11. **Appeal and Error.** Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement that the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.

12. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

13. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

14. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.

15. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

16. **Trial: Time.** Ordinarily, an objection must be made as soon as the applicability of it is known, or could reasonably have been known, to the opponent.

17. **Rules of Evidence: Hearsay: Appeal and Error.** Because of the factors a trial court must weigh in deciding whether to admit evidence under the residual hearsay exception, an appellate court applies an abuse of discretion standard to review hearsay rulings under this exception.

18. **Criminal Law: Rules of Evidence.** The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.

19. **Rules of Evidence: Hearsay.** In determining whether a statement is admissible under the residual hearsay exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, the materiality of the statement, the probative importance of the statement, the interests of justice, and whether notice was given to an opponent.

20. \_\_\_\_: \_\_\_\_. In determining admissibility under the residual hearsay exception, a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting the trustworthiness of a statement. A court may compare the declaration to the closest hearsay exception, as well as consider a variety of other factors affecting trustworthiness, such as the nature of the statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement.

Appeal from the District Court for Johnson County: Ricky A. Schreiner, Judge. Affirmed.

Timothy S. Noerrlinger, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Stacy M. Foust for appellee.

Funke, C.J., Cassel, Stacy, and Papik, JJ., and Daugherty and Meismer, District Judges.

Papik, J.

During a prison riot, a group of inmates attacked and killed another inmate. After an investigation, the State identified Eric L. Ramos as the primary participant in the attack and charged him with first degree murder, use of a weapon to commit a felony, and tampering with evidence. A jury convicted Ramos of those charges. He now appeals, asserting that the district court made several procedural and evidentiary errors. We find no merit to these alleged errors and affirm.

## I. BACKGROUND

In March 2017, a riot broke out at the Tecumseh State Correctional Institution (TSCI). During the fracas, Michael Galindo was attacked and killed by other inmates. After a review of video surveillance footage, investigators identified Ramos as the primary participant in the attack. The State charged Ramos with first degree murder, use of a weapon to commit a felony, and tampering with evidence. After a mistrial and two interlocutory appeals, see *State v. Ramos*, 31 Neb. App. 434, 981 N.W.2d 612 (2022), and *State v. Ramos*, 29 Neb. App. 511, 956 N.W.2d 45 (2021), the matter was tried before a jury.

According to evidence at trial, Ramos and Galindo were both assigned to cells in TSCI's housing unit 2. On March 2, 2017, correctional officers searched the cells in the 2A and 2B galleries of housing unit 2 while the inmates were at lunch. During the search, officers found and seized homemade alcohol. Upon returning from lunch and discovering that the alcohol was taken, the inmates started destroying property and setting fires. They propped open the doors to a miniyard shared by the 2A and 2B galleries, allowing them access to both galleries. The inmates covered their faces with towels and clothing. TSCI staff members evacuated for their own safety.

During the riot, 10 to 15 inmates attacked Galindo in the miniyard. Galindo retreated to the 2A gallery, where four inmates followed and repeatedly stabbed him. After the second attack was over, one of the four inmates returned alone and continued to stab Galindo. After the third attack, Galindo got up, ran to a cell, and locked himself inside. At some point, the window of the cell door was broken, most likely with part of an ice machine, and inmates spread fire into that cell. Correctional officers later found Galindo in the cell, deceased. An autopsy report concluded his cause of death was smoke inhalation exacerbated by sharp force and blunt force injuries.

Viewing video surveillance footage from multiple cameras, TSCI Cpl. Tatiana De Los Santos identified Ramos and his

cellmate as participants in the attack on Galindo. De Los Santos and Nebraska State Patrol Investigator Neal Trantham later used the footage to track Ramos' movements, and they testified that Ramos was the primary participant.

The jury found Ramos guilty of all charges. The district court subsequently determined that Ramos was a habitual criminal and sentenced him to life imprisonment for murder and to additional terms of imprisonment for the remaining convictions.

Ramos filed a timely appeal. We summarize additional relevant facts in the analysis section below.

## II. ASSIGNMENTS OF ERROR

Ramos assigns that the district court committed a number of procedural and evidentiary errors. We state and analyze each of these errors in the relevant sections of the analysis below.

## III. ANALYSIS

### 1. Constitutional Speedy Trial and Constitutional Right to Due Process

#### (a) Background

The State charged Ramos by information on October 19, 2017. A jury was empaneled and trial began in August 2018. After approximately a week of trial, Ramos successfully moved for a mistrial on the grounds that one of the State's witnesses had violated the district court's sequestration order.

Nearly 3 months after the mistrial, Ramos filed a plea in bar, alleging that the constitutional Double Jeopardy Clause prohibited his retrial. The district court denied the plea in bar. Ramos appealed to the Nebraska Court of Appeals, and the Court of Appeals affirmed, finding that the plea in bar was properly denied. See *State v. Ramos*, 29 Neb. App. 511, 956 N.W.2d 45 (2021). The Court of Appeals explained that when a mistrial is granted upon a defendant's motion, the Double Jeopardy Clause generally does not bar retrial. The Court of Appeals acknowledged that the Double Jeopardy Clause does

bar retrial in cases in which the State engages in prosecutorial misconduct designed to provoke the defendant into moving for a mistrial, but found that the State did not do so in Ramos' case.

The district court spread the Court of Appeals' mandate on March 31, 2021, and the retrial was scheduled to begin that August. Trial did not begin in August, however, because on July 21, Ramos filed another motion that postponed trial, this time a motion for discharge, alleging that his statutory and constitutional speedy trial rights had been violated.

The district court overruled the motion for discharge. It concluded that neither Ramos' statutory nor constitutional speedy trial rights had been violated. This prompted Ramos to, once again, return the case to the appellate courts. And, once again, Ramos' appeal was unsuccessful. See *State v. Ramos*, 31 Neb. App. 434, 981 N.W.2d 612 (2022). The Court of Appeals determined that Ramos' statutory right to a speedy trial had not been violated and, pursuant to our decision in *State v. Abernathy*, 310 Neb 880, 969 N.W.2d 871 (2022), that it lacked jurisdiction to review the district court's conclusion that Ramos' constitutional speedy trial rights had not been violated. The district court spread the Court of Appeals' mandate on December 30, 2022.

On October 24, 2023, Ramos filed another motion to discharge. Ramos contended that he should be granted discharge because the fact that he had not yet been tried violated his constitutional right to a speedy trial, as well as his constitutional right to due process. The district court overruled Ramos' motion, noting in its order that Ramos' plea in bar, first motion to discharge, and related appeals had caused a delay of over 1,300 days.

### (b) Assignments of Error

Ramos assigns that the district court erred (1) by failing to grant his motion for discharge based on his constitutional right to a speedy trial and (2) by failing to grant his motion for discharge based on his constitutional right to due process.

(c) Standard of Review

A criminal defendant's claim that he or she was denied due process as a result of delay presents a mixed question of law and fact. See *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). When reviewing a trial court's determination of a claim of denial of due process resulting from delay, an appellate court will review determinations of historical fact for clear error, but it will review de novo the trial court's ultimate determination as to whether any delay by the prosecutor caused substantial prejudice to the defendant's right to a fair trial. See *id.*

[1] In constitutional speedy trial cases, we have often said that in general, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous. See, e.g., *State v. Brown*, 310 Neb. 224, 964 N.W.2d 682 (2021); *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021); *State v. Lovvorn*, 303 Neb. 844, 932 N.W.2d 64 (2019). It is generally recognized, however, that constitutional speedy trial claims can also require resolution of questions of law. See, e.g., *U.S. v. Oliva*, 909 F.3d 1292, 1301 (11th Cir. 2018) ("[w]hether the Government violated a defendant's Sixth Amendment right to a speedy trial is a mixed question of law and fact"); *U.S. v. Summage*, 575 F.3d 864, 875 (8th Cir. 2009) ("'[w]e review the district court's findings of fact on whether a defendant's right to a speedy trial was violated [under the Sixth Amendment] for clear error but review its legal conclusions de novo'"); *Jones v. Morris*, 590 F.2d 684, 686 (1979) (explaining that while assessment of Sixth Amendment speedy trial claim involves analysis of underlying facts, balancing of relevant factors is "itself a question of law"). An appellate court reviews questions of law independently of the lower court's conclusion. *State v. Geller*, 318 Neb. 441, 16 N.W.3d 365 (2025). Our complete standard of review for constitutional speedy trial claims thus mirrors the standard of review we apply in statutory speedy trial cases: factual determinations

relevant to the claim are reviewed for clear error while legal determinations are reviewed de novo. See *State v. Nelson*, 313 Neb. 464, 984 N.W.2d 620 (2023).

### (d) Analysis

Ramos assigns that the district court erred in rejecting his second motion to discharge, which he based on the theory that the delay in bringing him to trial violated both his constitutional speedy trial right and his right to due process. For both claims, Ramos attributes the delay in bringing him to trial entirely to the mistrial that resulted when the State's witness contravened the sequestration order. We conclude that the district court did not err in overruling his second motion to discharge.

Little must be said to resolve Ramos' due process argument because that particular constitutional provision does not provide protection for the type of delay of which Ramos complains. We have recognized that the Fifth Amendment, generally, and therefore the Due Process Clause contained therein, has "only a limited role to play in protecting against oppressive delay in the criminal context." See *State v. Hettle*, 288 Neb. 288, 304, 848 N.W.2d 582, 596 (2014) (internal quotation marks omitted). This court has declined to find a due process violation where there has been a delay in bringing the accused to trial after arrest or indictment, as opposed to prearrest or indictment delay. See *id.* See, also, *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021); *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). Here, the delay occasioned by the mistrial occurred well after charges were brought against Ramos; thus, this interval falls outside the timeframe for due process claims involving delay in criminal prosecution.

Although the Due Process Clause does not provide protection for delay that occurs after the accused has been charged, there are constitutional speedy trial protections for that period. See U.S. Const. amend. VI and Neb. Const. art. I, § 11. See, also, S*tate v. Meese*, 257 Neb. 486, 599 N.W.2d 192 (1999), citing *United States v. Marion*, 404 U.S. 307, 92 S. Ct. 455,

30 L. Ed. 2d 468 (1971). Because the mistrial occurred after Ramos had been charged, constitutional speedy trial protections applied. But we find no merit to Ramos' contention that those protections entitle him to relief in this case.

[2] The same standards apply to a speedy trial analysis under both U.S. Const. amend. VI and Neb. Const. art. I, § 11. *State v. Loyd*, 269 Neb. 762, 696 N.W.2d 860 (2005). The U.S. Supreme Court has developed a balancing test to determine whether a defendant's constitutional right to a speedy trial has been violated. See *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). This balancing test involves four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. See *State v. Lovvorn*, 303 Neb. 844, 932 N.W.2d 64 (2019). None of these four factors, standing alone, is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial; rather, the factors are related and must be considered together with such other circumstances as may be relevant. *State v. Tucker*, 259 Neb. 225, 609 N.W.2d 306 (2000).

In Ramos' view, the *Barker* factors tilt decisively in his favor. He asserts that the reason nearly 6 years passed between the time he was first charged and his second motion for discharge was the violation of the district court's sequestration order by a witness for the State. He also claims that he has been prejudiced by this delay. On this score, he claims that he lost contact with several key witnesses that "appear to have exculpatory testimony" that would have been available to testify on his behalf but for the delay following the mistrial. Brief for appellant at 81.

We do not view the *Barker* factors to favor discharge in the way Ramos does. We do not dispute that significant time passed between the filing of the initial charges and Ramos' second motion for discharge. Neither do we dispute that at least some delay was caused by the State's witness' violation of the district court's sequestration order. As we will explain,

however, the delay attributable to the State is far less than that attributable to Ramos.

Although the mistrial occurred as a result of the State's witness' violation of the district court's sequestration order, much of the delay that followed the mistrial was brought about by Ramos. Ramos waited nearly 3 months after the mistrial before filing his plea in bar. Then, after his plea in bar was denied, he appealed that ruling. When the case returned to the district court and was scheduled for trial, Ramos again prevented trial from taking place by filing a motion for discharge. He then took another appeal after that motion for discharge was denied. As the district court observed, all told, Ramos' plea in bar, first motion to discharge, and related appeals caused a delay of over 1,300 days.

None of the foregoing should be taken as criticism of Ramos' choice to pursue a plea in bar, his first motion for discharge, or related appeals. He was entitled to seek those avenues of relief. As the U.S. Supreme Court has explained, however, defendants should generally not, after filing pretrial motions and interlocutory appeals, be able to use the attendant delay as a basis for claiming they were denied their right to a speedy trial. See *United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986) ("[a] defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial"). See, also, *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

In addition, to the extent some delay caused by the mistrial was not attributable to Ramos, there is no basis to say that such delay was the result of a "deliberate attempt to delay the trial in order to hamper the defense," the type of delay that is to be heavily weighted against the State under *Barker v. Wingo*, 407 U.S. 514, 531, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). As the Court of Appeals concluded in its opinion affirming the district court's denial of Ramos' plea in bar, there was a lack of evidence that the mistrial arose because

of intentional prosecutorial misconduct or that prosecutors intended to provoke a mistrial. See *State v. Ramos*, 29 Neb. App. 511, 956 N.W.2d 45 (2021).

Finally, we note that while Ramos suggests that he lost contact with witnesses who would have provided exculpatory testimony after the mistrial, he does not specify who those witnesses are or what testimony they would have provided.

To recap, most of the delay in this case was attributable to Ramos' pretrial motions and interlocutory appeals. The delay caused by the mistrial itself—the only delay Ramos complains of—was relatively short and not the result of a deliberate attempt by the State to delay trial for a tactical advantage. And while Ramos claims that he was prejudiced, he provides little detail as to how. With these considerations in mind, we cannot say that Ramos' constitutional right to a speedy trial was violated.

## 2. *Batson* Challenge

### (a) Background

During jury selection, the State used one of its peremptory challenges to strike a prospective juror. During voir dire, that prospective juror explained that serving on the jury for 3 weeks would be a hardship for her. She was a bedside nurse, working 46 hours per week at different hospitals; and she was the only radiology technician at one clinic where she worked part time. She stated it would be "really, really hard to staff adequately" because she was "not quite sure" there were people capable of filling in for her. The prospective juror also was a full-time graduate student with a thesis presentation due later the same month that she "definitely probably cannot miss." In addition, her husband had broken his foot, and she was working four shifts per week to pay the bills, rather than the required three shifts. The prospective juror stated that she could try to pay attention and to give the State and Ramos a fair trial, adding that she had a diagnosis of hyperactivity for which she took medication.

Ramos challenged the State's strike of the potential juror under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 69 (1986), on racial grounds. Ramos argued that the State struck the potential juror because she was Latino like Ramos.

The State responded that the potential juror was stricken for a race-neutral reason: out of concern that she could not focus to the degree necessary during trial because she had a lot "on her plate" with her work situation, her thesis presentation, and her role as "sole breadwinner." The district court overruled Ramos' *Batson* challenge.

### (b) Assignment of Error

Ramos assigns that the district court erred in overruling his *Batson* challenge.

### (c) Standard of Review

[3] An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory. *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017).

### (d) Analysis

Ramos contends that the district court committed reversible error in overruling his *Batson* challenge. According to Ramos, the State's peremptory strike of the prospective juror was inherently discriminatory because it was solely based on the prospective juror's race, in violation of *Batson, supra*. We disagree.

Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent

of the strike. *Id.* First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. And third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.*

Once the trial court has decided the ultimate question of intentional discrimination, however, the questions on appeal are only whether the prosecutor's reasons were facially race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous. See *id.* We are unpersuaded that the trial court erred on either question.

As to whether the State gave facially race-neutral reasons, the State explained to the district court that it struck the prospective juror due to concern that her work situation, school obligations, and financial pressures would prevent her from adequately focusing on Ramos' trial. These are plainly race-neutral reasons. "Only inherently discriminatory explanations are facially invalid," *Clifton*, 296 Neb. at 149-50, 892 N.W.2d at 127, and these reasons are in no way inherently discriminatory.

Neither has Ramos shown that the district court clearly erred by finding that the race-neutral explanations were genuine, rather than pretexts for racial discrimination. Ramos acknowledges that a prospective alternate juror, who was not struck by the State, may have been Latino, but he asserts that the race-neutral reason the State offered for the peremptory strike at issue here must have been pretextual because the State struck "the only possible Latino, who was not an alternate juror." Brief for appellant at 79. In determining whether the State's proffered race-neutral explanation for a peremptory strike was pretextual, a court may consider whether "the prosecutor's criterion has a disproportionate impact on a particular race." *Clifton*, 296 Neb. at 151, 892 N.W.2d at 127. But in this case, the record does not show the racial makeup of the

entire jury pool and thus leaves us without the information necessary to evaluate whether the State's criterion disparately impacted Latino members of the jury pool.

In any event, the district court apparently concluded that the State's explanation for its peremptory strike was genuine, rather than pretextual, and a trial court's determination that the prosecutor's race-neutral explanation was not pretextual is difficult to overturn on appeal. That is so because such a determination often involves the trial court's evaluation of a prosecutor's credibility. Accordingly, appellate reversal is appropriate only in exceptional circumstances. See *id.* We see no exceptional circumstances here. The prosecution identified a compelling race-neutral explanation for its peremptory strike, and there is a dearth of evidence suggesting racial discrimination. We conclude that the district court did not clearly err in finding that the prosecutor's race-neutral reason for striking the juror was genuine rather than pretextual. Ramos' challenge to the district court's resolution of his *Batson* challenge lacks merit.

### 3. Motion for Mistrial; Alternative Motion for Continuance

#### (a) Background

In January 2018, prior to the first trial, Ramos requested, among other discovery materials, "[e]vidence of activities of co-defendants or accomplices" and "[a]ny and all statements made available to the State, including but not limited to police reports, narrative reports and notes prepared by any investigating personnel . . . and any 'Brady Material.'" The district court ordered the State to provide Ramos with statutory discovery pursuant to Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2024). Subsequently, the district court further ordered the State to "make available to the [d]efendant any and all evidence requested in the motion that is in the possession of the State; that . . . is material to [d]efendant's defense; and/or that the [S]tate intends to introduce as evidence during the

trial." The State supplemented discovery several times. See *State v. Ramos*, 29 Neb. App. 511, 956 N.W.2d 45 (2021).

In October 2023, Ramos moved for additional discovery under § 29-1912. He requested that the district court order the State to permit him, through his counsel, to inspect and copy or photograph "[a]ny documents or videos compiled related to other suspects for the death of . . . Galindo by investigators of the Nebraska State Patrol or the Nebraska Department of Corrections staff." The district court granted Ramos' motion "to release any information on other suspects identified in videos by the State," which included a spreadsheet that Trantham had prepared.

Trial commenced in November 2023. On cross-examination, Ramos questioned Trantham and De Los Santos about the large number of inmates in the 2AB miniyard who were evaluated after the riot. Many had soot on their skin or on their clothing, injuries to their hands, or the appearance of bloodstains on their clothing, but Trantham and De Los Santos could not identify them or track their movements on the surveillance footage. Those inmates included Lucas Peterson and brothers John Meyers and Robert Meyers. Ramos did not have soot on his hands or injuries on his hands.

John Meyers testified on behalf of Ramos that he did not remember observing the assault on Galindo in the miniyard, that he could not identify anyone in surveillance footage of the miniyard, and that he did not see Ramos with a weapon or fire.

The day after John Meyers testified, Ramos recalled Trantham to testify in his case in chief. Trantham testified that he had provided reports to the State about followup interviews of some inmates conducted in the spring or summer of 2023. After Trantham's testimony, the State provided Ramos with exhibit 458, a 12-page document that included reports of interviews with inmates Peterson and Derek Tilden.

According to exhibit 458, Trantham interviewed Peterson in August 2023. Exhibit 458 noted that another inmate, Philip Muratella, had previously been interviewed and said that

Peterson had confided to him that he participated in Galindo's murder and felt guilty about it. During the interview with Trantham, Peterson claimed that he had remained in the mini-yard during the riot and denied participating in any illegal activities during that time. He stated he was not familiar with Muratella but that he had spoken to an inmate named "Lucky" about the events in general. The report noted that "Lucky" was a possible nickname for Muratella.

Exhibit 458 also included an investigator's interview with Tilden in May 2023 about a letter he wrote regarding Galindo's murder. Tilden told the investigator that he had become friends with the Meyers brothers. He claimed that the Meyers brothers had bragged to him about stabbing Galindo and setting him on fire because Galindo had disobeyed their order not to use the phone during the riot. Tilden recalled that the Meyers brothers named other participants in the murder, and one of those participants was Ramos. Tilden told investigators that "a good inmate to speak with would be Charles Eagle Boy." (Emphasis omitted.) Neither Tilden nor Eagle Boy were housed in housing unit 2 on the date of the riot, so they were not included in lists of inmates provided to the defense.

Ramos moved for a mistrial on grounds that the State had not complied with discovery and *Brady* requirements. The prosecutor explained that the late disclosure of exhibit 458 was inadvertent. The district court suggested that Ramos could have learned about the reports during testimony earlier in the trial; it overruled Ramos' motion for mistrial.

The next day, Ramos renewed his motion for mistrial and, in the alternative, moved to continue the trial for 2 weeks so that he could investigate the information in exhibit 458. Ramos introduced evidence showing that he did not know about the information in exhibit 458 and that his investigator had interviewed the Meyers brothers without the benefit of Tilden's statements. Defense counsel argued to the district court that the late disclosure had prejudiced Ramos and that additional time was needed to investigate the Meyers brothers and Tilden.

The district court overruled the motions. The defense proceeded with testimony by Ramos and rested the same day.

Other exhibits, exhibits 470 and 471, were disclosed after trial. Exhibits 470 and 471 include much of the same information as exhibit 458, along with an additional interview. Because exhibits 470 and 471 were disclosed after trial, they are discussed below in the section addressing Ramos' posttrial motion for new trial.

### (b) Assignments of Error

Ramos assigns that the district court erred in (1) failing to grant a mistrial after the State disclosed "newly discovered evidence" during his case in chief or, alternatively, (2) failing to grant him a 2-week continuance following that disclosure.

### (c) Standard of Review

[4-6] An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion. *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024). Similarly, a decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Turner*, 315 Neb. 661, 998 N.W.2d 783 (2024). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

### (d) Analysis

Ramos claims that he was entitled to a mistrial or, in the alternative, a continuance, because the disclosure of exhibit 458 on the penultimate day of trial violated discovery orders pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and § 29-1912. We ascertain no abuse of discretion by the district court in declining to grant a mistrial or continuance.

[7] We first address Ramos' reliance on *Brady*. Under *Brady*, the nondisclosure by the prosecution of material evidence favorable to the defendant, requested by the defendant, violates due process, irrespective of the good faith or bad faith of the prosecution. We have held, however, that due process is not violated where, as was the case with exhibit 458 here, the evidence is disclosed during trial. See *Turner, supra*. See, also, *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999).

Ramos acknowledges our precedent that a defendant cannot establish a *Brady* violation based on evidence disclosed during trial, but argues that in this case, the evidence was disclosed so late in the trial he was unable to effectively use it. We are aware that some courts have recognized the possibility of a viable *Brady* claim based on a midtrial disclosure of evidence. See, e.g., *U.S. v. Burke*, 571 F.3d 1048 (10th Cir. 2009); *U.S. v. Walsh*, 75 F.3d 1 (1st Cir. 1996). There is no need, however, for us to consider whether Ramos could establish a viable *Brady* claim on the theory that the evidence was disclosed too late for him to use it. That is because, even if the fact that the State disclosed exhibit 458 during trial is set to the side, Ramos would still be unable to establish a successful *Brady* claim.

For Ramos to succeed on a *Brady* claim, he must show that the prosecution suppressed favorable material evidence. Evidence is material under *Brady*, however, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). Ramos need not show that acquittal was more likely than not had the evidence been disclosed. See *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Instead, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*, 514 U.S. at 434. Ramos must show

that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." See *id.*, 514 U.S. at 435.

But even assuming exhibit 458 had been disclosed long before it was, we discern no reasonable probability that Ramos' trial would have turned out differently. Exhibit 458 contained witness accounts that inmates other than Ramos were involved in attacking Galindo. The State, however, had already presented evidence that Ramos was one of a host of inmates involved in the attack on Galindo. After 10 to 15 inmates first attacked Galindo in the miniyard, four inmates followed Galindo to the 2A gallery and repeatedly stabbed him there. Following that attack, one of those four inmates returned to stab Galindo again. Galindo then fled to a cell; the cell's window was broken, most likely by part of an ice machine obtained by an inmate, allowing 11 inmates to spread fire into the cell. Given the number of inmates that participated in the attacks, additional evidence that some specific inmates were involved would not have aided Ramos in showing that he was not involved. Moreover, exhibit 458 referenced Tilden's assertion that the Meyers brothers had identified Ramos as one of Galindo's assailants. Rather than helping Ramos' case, this information in exhibit 458 would have harmed it. Under these facts, we remain confident in the outcome of the verdict notwithstanding any suppression of exhibit 458 and thus conclude that exhibit 458 was not material under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Because exhibit 458 does not meet the materiality standard for *Brady*, the district court did not err in finding there was no *Brady* violation. And because there was no *Brady* violation, the district court did not err by denying Ramos' motion for a mistrial to the extent it was premised on *Brady*.

This leaves Ramos' argument that he was entitled to a mistrial or, alternatively, a continuance, as a result of the State's violation of the district court's discovery orders entered pursuant to Nebraska's criminal discovery statute, § 29-1912.

Section 29-1912 sets out specific categories of information that a defendant may request the court to order the State to disclose. See § 29-1912(1). The State does not dispute that here, Ramos sought information pursuant to § 29-1912(1)(g): "Reports developed or received by law enforcement agencies when such reports directly relate to the investigation of the underlying charge or charges in the case." Nor does the State dispute that exhibit 458 qualifies as such a report.

Section 29-1912(2) governs the trial court's decision whether to order the State to disclose the requested information, providing that the trial court "shall consider," "[i]n the exercise of its judicial discretion," one or more of specific factors set forth in subsection (2), "among other things." One of the specific factors that the trial court "shall consider" "[i]n the exercise of its judicial discretion" is whether "[t]he request is material to the preparation of the defense." See § 29-1912(2)(a). There is no dispute that upon consideration, the district court ordered disclosure of the information Ramos requested, which would have included exhibit 458. However, the State did not disclose exhibit 458 until the penultimate day of trial. The State does not dispute that this was a violation of the district court's discovery order.

Another statute, Neb. Rev. Stat. § 29-1919 (Cum. Supp. 2024), provides that, in response to a violation of a discovery order pursuant to § 29-1912, the trial court "may" order production of undisclosed materials, grant a continuance, exclude the undisclosed material from evidence, or "[e]nter such other order as it deems just under the circumstances." This gives the trial court broad discretion that, depending on the circumstances, may include the entry of no order at all. See *State v. Vicars*, 207 Neb. 325, 299 N.W.2d 421 (1980). In relation to exhibit 458, the district court responded to the State's violation of its discovery order by overruling Ramos' requests for a mistrial and, alternatively, a 2-week continuance. Ramos asserts this was error.

Ramos argues that our decisions in *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997), and *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995), support his argument that the denial of his motion for a continuance was an abuse of discretion. In *Kula*, we held that a trial court abused its discretion by failing to grant the defendant's motion for a continuance after the State disclosed, on the first day of trial, information regarding its investigation of other suspects, which it had been ordered to produce pursuant to § 25-1912. In the course of explaining why the denial of a continuance amounted to an abuse of discretion in that case, we made the following statement:

Under § 25-1912, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

*Kula*, 252 Neb. at 486, 562 N.W.2d at 727.

In support of this proposition, our opinion in *Kula* cited our opinion in *Null*, *supra*. In *Null*, we stated that "[u]nder § 29-1912, the test for whether nondisclosure is prejudicial is whether the information sought is material to the presentation of the defense." 247 Neb. at 207, 526 N.W.2d at 231. We then stated that information is material if it meets the same "'strong indication that such information will play an important role'" standard articulated in *Kula*. *Null*, 247 Neb. at 207, 526 N.W.2d at 231. Ramos argues that exhibit 458 meets the standard of materiality articulated in *Kula* and *Null* and that it follows that he suffered prejudice and the district court abused its discretion by denying his requests for a mistrial or, alternatively, a continuance.

Although some language in *Kula* and *Null* could be understood to say that a defendant is prejudiced in any instance in which the State violates a discovery order under § 29-1912 by

failing to timely disclose information that meets the materiality standard articulated in those opinions, we do not believe that is a correct statement of the law. To explain why, it is necessary to recount some history.

The "strong indication" materiality standard discussed in *Kula* and *Null* first entered Nebraska jurisprudence in *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983). In that case, we stated that "[i]nformation is material in the preparation of a defense if there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal," citing an opinion from the U.S. District Court for the District of Columbia. See *Brown*, 214 Neb. at 674-75, 335 N.W.2d at 547, citing *United States v. Felt*, 491 F. Supp. 179 (D.D.C. 1979). In the federal courts, this materiality standard is used to determine whether the government is obligated to disclose information to a defendant under the Federal Rules of Criminal Procedure governing discovery. See, e.g., *U.S. v. Lloyd*, 992 F.2d 348 (D.C. Cir. 1993); *U.S. v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007). In *Brown* and cases that followed it, we appear to have adopted that same standard for determining whether information is "material" for purposes of § 29-1912(2)(a). See, e.g., *State v. Lotter*, 255 Neb. 456, 491, 586 N.W.2d 591, 619 (1998) ("[t]hus, under § 29-1912, evidence is material when there is a strong indication that it will play an important role in, among other things, assisting impeachment or rebuttal"), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999).

In *Null*, however, we seem to have added to the materiality standard's function. In that case, we said for the first time, and with a citation to *Brown* unaccompanied by additional authority or explanation, that

[u]nder § 29-1912, *the test for whether nondisclosure is prejudicial* is whether the information sought is material to the presentation of the defense, meaning that there is a "strong indication that such information will play an

important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal."

*State v. Null*, 247 Neb. 192, 207, 526 N.W.2d 220, 231 (1995) (emphasis supplied), quoting *Brown, supra*. We repeated the same idea in *Kula* when we said that "[u]nder § 25-1912, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense." *State v. Kula*, 252 Neb. 471, 486, 562 N.W.2d 717, 727 (1997).

To the extent *Kula* and *Null* can be read to say that a defendant is automatically prejudiced by a failure to disclose material information, we believe that was erroneous. The materiality standard first cited in *Brown, supra*, is relevant to whether the trial court should order disclosure of the information a defendant seeks. It does not follow that every failure to disclose material information automatically results in prejudice and the need for a particular sanction. This is demonstrated by the statutory language of § 29-1919 that, as mentioned above, gives trial courts considerable discretion in fashioning remedies for discovery violations, rather than dictating anything in the nature of automatic sanctions.

Furthermore, it is illogical to say that any failure to disclose material information will result in prejudice to the defendant. The materiality standard is focused on whether information might be useful to preparing a defense. A particular piece of information could, viewed on its own, be useful for preparing a defense, and yet its nondisclosure might, when viewed in light of other evidence introduced at trial, not result in prejudice. A failure to disclose material information might not result in prejudice if, to note a couple examples, the withheld information is cumulative of other evidence received at trial or there was no reasonable possibility that disclosure of that information could have changed the verdict. See, e.g., *U.S. v. Rosario-Peralta*, 199 F.3d 552 (1st Cir. 1999) (concluding

defendants were not prejudiced by prosecution's failure to disclose material information when nondisclosure did not impede presentation of defense and did not call jury's verdict into question); *United States v. Brown*, 562 F.2d 1144 (9th Cir. 1977) (explaining that to warrant reversal for prosecution's failure to disclose information requested in discovery, both materiality and prejudice must be shown); *U.S. v. Martinez*, 844 F. Supp. 975 (S.D.N.Y. 1994) (separately analyzing materiality and prejudice in determining whether defendant was entitled to new trial for prosecution's failure to disclose information requested in discovery). To the extent *Kula* and *Null* say that any failure to disclose material information under § 29-1912 automatically results in prejudice, they are disapproved.

We conclude that this is a case where the belated disclosure of exhibit 458 caused no prejudice because there was no reasonable possibility that earlier disclosure would have changed the outcome at trial. Ramos argues that he should have been able to investigate Muratella's claim that Peterson had told him he participated in Galindo's murder and Tilden's statement that the Meyers brothers had told him they too participated in Galindo's murder. But even if Ramos was able to get such assertions into evidence, we see no reasonable probability of a different outcome. As we have explained, there was no dispute that many inmates participated in some form in Galindo's killing. Claims that Peterson or the Meyers brothers were among those participating would not have undermined the State's case as to Ramos' guilt. This is especially true regarding Tilden's claim that the Meyers brothers were involved, as Tilden also relayed the Meyers brothers' claim that Ramos was involved.

[8,9] A court does not abuse its discretion in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice because of that denial. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025). In a similar vein, to prove error predicated on the failure to grant a

mistrial, the defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *State v. Haynie*, 317 Neb. 371, 9 N.W.3d 915 (2024). For reasons we have explained, Ramos has not shown that he was prejudiced by the denial of his motion for continuance or mistrial. Accordingly, these assignments of error lack merit.

### 4. MOTION FOR NEW TRIAL

#### (a) Background

A few days after the jury returned its verdict, Ramos filed a motion for new trial pursuant to Neb. Rev. Stat. § 29-2101 (Reissue 2016). According to the motion and his counsel's clarifying comments at a hearing, Ramos sought a new trial on grounds of juror misconduct, prosecutorial misconduct because of alleged *Brady* violations, and irregularity in the proceedings.

At the beginning of the hearing, Ramos asked for a continuance so that he could obtain phone records and recordings relating to an inmate who claimed to have had phone conversations with a juror during the trial. The district court overruled the motion to continue.

Ramos then presented several exhibits, including affidavits from both of his defense counsel and reports and recordings of interviews he received from the State after trial.

One defense counsel affidavit addressed exhibit 458, which was the basis of the motion for mistrial discussed above, as well as exhibits 470 and 471. Counsel stated that he received the reports in exhibit 458 from the State on the second to last day of trial and that he received the reports and recordings in exhibits 470 and 471 from the State after trial, on January 18, 2024.

In a second affidavit, defense counsel made statements about the conversations between the inmate and the juror that were the basis of the juror misconduct claim.

Exhibits 470 and 471 contained much of the same information about Tilden and Muratella as exhibit 458, but they also included a recording and summary of Trantham's March 2021 interview with Muratella, who was Galindo's brother-in-law. According to Muratella's interview, about 2½ years earlier, Peterson confessed to him that he participated in Galindo's murder. At that time, Peterson also told Muratella that it was "'either me or him'" and that two of the leaders involved in Galindo's murder went by the names "Monster" and "Sicko." Muratella identified "Monster" and "Sicko" as the Meyers brothers.

The district court overruled Ramos' motion for new trial, finding that the allegations of juror misconduct were not supported by affidavits and that Ramos had otherwise failed to provide sufficient evidence to warrant a new trial on any statutory ground.

### (b) Assignment of Error

Ramos assigns that the district court erred by failing to grant his motion for new trial.

### (c) Standard of Review

[10] The standard of review for a trial court's denial of a motion for new trial after an evidentiary hearing is whether the trial court abused its discretion in denying the motion. *State v. Blocher*, 313 Neb. 699, 986 N.W.2d 275 (2023).

### (d) Analysis

On appeal, Ramos maintains that the late disclosure of exhibits 470 and 471 and juror misconduct justified a new trial. We are unconvinced.

We begin with exhibits 470 and 471. On appeal, Ramos refers to § 29-2101(5) and characterizes these exhibits, in the language of the statute, as "newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at the trial." He

asserts that the State ought to have disclosed this evidence in response to Ramos' discovery requests and that he could not have otherwise discovered exhibits 470 and 471 with reasonable diligence and presented them at trial. He submits that if he had been made aware of the existence of the exhibits prior to trial, he would have been able to further investigate the claims of Tilden and Muratella, which would have included interviewing Eagle Boy, Peterson, and the Meyers brothers about their prior statements.

Ramos' motion initially cited newly discovered evidence as one of the grounds for new trial. However, at the hearing, his counsel clarified that, regarding exhibits 470 and 471, he was seeking a new trial based on prosecutorial misconduct in the form of a *Brady* violation, and his brief on appeal argues that the State ought to have disclosed the evidence when Ramos requested discovery. When a motion for new trial based on "newly discovered evidence" is, in substance, based on a claim that the prosecution violated its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), to disclose material evidence favorable to the defendant, we analyze it under the *Brady* framework. See *State v. Lykens*, 271 Neb. 240, 710 N.W.2d 844 (2006). We apply the *Brady* framework here.

For Ramos to succeed on his *Brady* claim as to exhibits 470 and 471, he must show that the prosecution suppressed favorable material evidence. As we recounted above, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

Under the preceding standard, we conclude that Ramos has not shown that the prosecution suppressed favorable material evidence in not disclosing exhibits 470 and 471 until after trial. Much of the content of those exhibits was duplicative of exhibit 458. Thus, when Ramos moved for new trial,

only a portion of the information in exhibits 470 and 471 was undisclosed. That undisclosed information was Peterson's claim, relayed through Muratella's interview, that the Meyers brothers were two of the leaders in Galindo's death and that Peterson was also involved. Even if the Meyers brothers and Peterson were involved in Galindo's death, it would not prove that Ramos was not involved, and indeed, according to other evidence, the Meyers brothers stated that Ramos was involved. Accordingly, there is not a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; that is, the new information does not undermine confidence in the verdict. Because Ramos has not demonstrated a *Brady* violation as to exhibits 470 and 471, we conclude that the district court did not err in overruling his motion for new trial.

[11] Regarding juror misconduct, Ramos reiterates the evidence presented at the hearing on his motion for new trial but offers no analysis. He simply states that the district court erred in overruling his motion for new trial due to juror misconduct and in "denying his motion to continue to determine the scope of any alleged juror misconduct." Brief for appellant at 73. Generally, only those issues specifically assigned and specifically argued on appeal will be considered by the appellate court. See *State v. Goynes*, 318 Neb. 413, 16 N.W.3d 373 (2025). Ramos has not assigned error regarding his motion to continue, and his cursory statement that the district court erred in declining to grant a new trial or continuance concerning juror misconduct does not amount to an argument. Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy the requirement that the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). We need not consider Ramos' allegations regarding juror misconduct further.

### 5. "Rule 701" Opinion Evidence Identifying Ramos

#### (a) Background

At trial, the State presented lay witness opinion evidence identifying Ramos on video surveillance footage captured by multiple cameras. The quality of the footage made details difficult to discern at times, and some cameras recorded events at a distance.

Trantham was assigned as the case agent for the Nebraska State Patrol on the investigation. He and De Los Santos reviewed the video footage together. De Los Santos, who knew how to use the surveillance system, had already completed an initial analysis of the footage that led her to identify two possible suspects. Trantham testified that Ramos and his cellmate were named at an initial briefing as the two possible suspects. Trantham explained that he and De Los Santos analyzed the surveillance footage forward and backward. They observed an individual with a distinct pattern of dark or wet spots on the back of his sweatshirt, who Trantham referred to as "inmate number one" or "suspect number one." We will hereafter refer to that inmate as "suspect number one."

Trantham testified that they tracked suspect number one based on other characteristics: He was bald, had light brown skin, had facial hair, and wore one pair of sunglasses, with another pair hanging from his collar; and at one point, the entire left side of his sweatshirt became wet. Trantham observed that in the miniyard, suspect number one uncovered his face, changed his clothes, and burned the clothes he had been wearing. Trantham also noted that suspect number one tended to return to the cell assigned to Ramos and interacted with an individual believed to be Ramos' cellmate.

Trantham recounted that suspect number one and three other suspects were involved in attacking Galindo but that suspect number one had the most involvement: He stabbed Galindo in the 2A gallery, returned to stab him again, obtained a part that had been broken from an ice machine, and set fire to the back

of the 2A gallery, where Galindo was found dead. Without objection, Trantham testified that "we" identified suspect number one as Ramos.

De Los Santos testified that she had worked in TSCI's intelligence unit doing video review from 2015 until 2020. Previously, she had worked as a correctional officer in other areas of TSCI, including the visiting room. De Los Santos testified that through her different job responsibilities, she familiarized herself with as many of the inmates as possible. She testified that she could recognize approximately 80 percent of the inmate population and that she made efforts as part of her daily duties in video review to identify the rest through such factors as complexion, associates, cell assignment, how clothing was worn, facility passes, gait, movements, facial hair, baldness, tattoos, and other physical characteristics. De Los Santos explained that her work had required her to identify hundreds of inmates, but she did not identify anyone unless she was 100 percent certain.

De Los Santos testified that she first became acquainted with Ramos sometime in 2014, when her primary responsibility was to monitor inmates and their visitors. She estimated she had interacted with Ramos approximately five times during visiting hours and more than five times working either in the yard or in other areas. She testified that she had very close contact with Ramos on the main yard at least 10 times. De Los Santos explained that her interaction with Ramos during visiting hours, which involved constantly monitoring 1-hour to 3-hour sessions, required her to become familiar with his appearance and mannerisms. But De Los Santos testified that she became familiar with Ramos mostly through video surveillance because she observed him that way daily.

De Los Santos testified that during the days following the riot, she spent hundreds of hours reviewing video footage to try to identify who had attacked Galindo. She testified that she could identify two of the four individuals involved in the attack in the 2A gallery. She was around 80 percent certain of

her initial identifications, so she continued to review the footage to track the movements of those two individuals. De Los Santos testified that Ramos' cellmate was one of the individuals she could identify. She identified him based on his build, cell assignment, associates, clothing, complexion, and a face tattoo that was visible when he removed his mask. The second individual De Los Santos identified also removed his mask, which she testified formed her conclusion of who he was. She observed footage of him removing his mask and changing his clothes. She could see that he had short-shaven facial hair and was bald. She said that his build, his frequent interaction with the other identified individual, and his olive complexion helped her identify him. Over Ramos' objection based on Neb. Rev. Stat. § 27-701 (Reissue 2016), De Los Santos testified that she identified Ramos as the second individual.

In the examination that followed, the State elicited De Los Santos' testimony identifying Ramos in specific parts of the video footage shown to the jury. The district court allowed this testimony over Ramos' objection, see § 27-701, finding that it was rationally based on De Los Santos' perception, her location, her employment, and her contacts with Ramos. The district court also found De Los Santos' testimony was helpful to the jury under the circumstances, but it granted Ramos a continuing objection. Specifically, De Los Santos identified Ramos in the footage as one of the four participants in the initial attack of Galindo in the 2A gallery, as the individual who returned and stabbed Galindo, as the individual who retrieved an ice machine part most likely used to break the window of the cell where Galindo was found, and as the first individual to set fire to the rear of the 2A gallery where Galindo was found dead.

De Los Santos testified that it was a combination of factors that led her to identify Ramos. She was able to track and identify Ramos after observing the following: two distinct wet spots on the back of his sweatshirt, a towel that he had used during his individual attack on Galindo and then discarded in

the fire, a view of his face and bald head when he removed his mask and changed clothes, the way he wore his khaki pants, the sunglasses clipped to his collar, the drenched left side of his sweatshirt, the way that a towel was tied around his face and neck, his interactions with his known associates, his consistent return to his assigned cell, and his posture and the way he walked. De Los Santos testified that after comparing a photograph of Ramos to the video footage, she was 100 percent certain that he was involved in Galindo's murder.

Trantham and De Los Santos compiled a sequence of video clips from various cameras to highlight the observations that formed their opinions about the identifications. Trantham asked Kevin Klippert to watch the video compilation to see if he could identify anyone. Klippert testified that he was Ramos' case manager at a different correctional facility from November 2013 until February 2014. Although they only met in person two or three times, Klippert testified that he would see Ramos in passing during most of his shifts, sometimes more than once a day. During that time, he saw Ramos with and without a stocking hat and sunglasses, his build, his skin tone, his facial features, his facial hair, his hair, and his walk. Klippert testified that he went to work as a unit manager at TSCI in June 2016. After Ramos was transferred to TSCI, Klippert saw him once or twice a week during mass movements of inmates, and, according to Klippert, he could recognize Ramos in the crowd. Klippert identified Ramos at trial as the unmasked individual who changed his clothes in the miniyard and later returned with the side of his sweatshirt appearing wet. Klippert explained that he could identify Ramos because he saw his face, because he was wearing a stocking hat and sunglasses as he normally did, because of his build, because of his stature, and because of his gait or walk. Klippert testified that he could identify Ramos with 100-percent certainty.

Ramos did not object to Klippert's identification testimony until after the State's direct examination. He asserted that

Klippert's testimony was improper opinion evidence under § 27-701 and asked that the district court strike it and admonish the jury. Stating that Klippert's testimony was "exactly like . . . De Los Santos[']," the district court overruled the objection.

### (b) Assignment of Error

Ramos assigns that the district court erred in allowing the State to present opinion evidence by De Los Santos and Klippert that was improper under § 27-701.

### (c) Standard of Review

[12] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[13,14] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Anthony, supra.* An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *Id.*

[15] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

### (d) Analysis

Ramos contends that the district court erred in allowing the State to present testimony by De Los Santos and Klippert identifying him as one of Galindo's attackers depicted in surveillance footage. Ramos bases this argument on § 27-701, which provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited

to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Ramos asserts that due to the "limited" nature of De Los Santos' and Klippert's encounters with him, their testimony identifying him was not helpful to the jury. Brief for appellant at 75. Ramos claims that De Los Santos and Klippert had "no better ability" to identify individuals in the video footage "than any other person," including the trier of fact. *Id*. at 74-75.

We see no abuse of discretion in the district court's decision to admit De Los Santos' testimony. Given the indistinct quality of some of the video footage and De Los Santos' familiarity with Ramos, summarized above, it is clear that she was indeed in a better position to identify Ramos than the jury was. Her testimony was rationally based on her perception of Ramos on numerous occasions in person and in video footage. As the jury had no such familiarity with Ramos, De Los Santos' testimony definitively identifying him was helpful and therefore admissible. It was then up to the jury to decide how much weight to attribute to De Los Santos' admissible testimony. See *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021) (credibility and weight of witness testimony are for jury to determine).

[16] As for Klippert's testimony, it appears that Ramos' objection thereto was too late to preserve that issue for full appellate review. As noted above, Ramos did not object to Klippert's testimony on § 27-701 grounds until after the State had completed its direct examination, well after Klippert had identified Ramos as one of Galindo's attackers. Ordinarily, an objection must be made as soon as the applicability of it is known, or could reasonably have been known, to the opponent. *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992). See, also, *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020) (continuing objections are not

applicable to testimony given by different witness when no objection is made to that witness).

But even assuming Ramos' objection to Klippert's testimony was preserved, our reasoning that the district court did not abuse its discretion in permitting De Los Santos' identification testimony applies equally to Klippert's.

### 6. Motion to Transport Witnesses; Alternative Requests to Invoke Residual Hearsay Exception

#### (a) Background

Prior to trial, the district court ordered the Nebraska Department of Correctional Services (DCS) to transport listed inmates for trial, pursuant to Ramos' motion. Those inmates included Jeff Boppre and Dammon Haynes. Neither inmate was confined in Saline County, the venue of Ramos' trial. Ramos also filed residual hearsay notices for Boppre and Haynes. Boppre and Haynes later filed motions to quash their subpoenas. At the hearing on their motions, Boppre and Haynes both testified that they were not present for the riot and did not have any information about Galindo's murder. The district court overruled the motions to quash.

At trial, Trantham testified that he investigated possible reasons why Galindo was killed. According to Trantham, there was evidence that Galindo "had a drug issue." He testified, "We had one inmate that had mentioned hearing an argument of some kind about a drug being shorted on drug transfer, drug transaction. We tried to flush that out during interviews and came up with a dead-end." Relatedly, an inmate testified that he told investigators that he had heard Galindo was killed by his drug suppliers; the inmate further testified that Ramos was with him during the riot and not involved in killing Galindo.

After the State rested its case in chief, Ramos asked the district court to enforce his subpoena of Boppre and to direct DCS to bring him to court the following day, by force if necessary, because Boppre was material to Ramos' defense.

To avoid putting others at risk of physical harm, the district court declined to authorize the use of force. Alternatively, Ramos asked the district court to grant his residual hearsay request. The State stipulated that Boppre was unavailable for purposes of the residual hearsay exception. Ramos' counsel subsequently explained that Ramos was not proceeding with his residual hearsay request as to Haynes, "given some of the testimony and evidence that's already before the jury on that issue."

At a hearing on the residual hearsay request as to Boppre, the district court heard and received exhibits and testimony related to interviews with Boppre conducted by Trantham. There was evidence that upon Boppre's request, Trantham interviewed Boppre in March and June 2017. Boppre told Trantham that he and Galindo had become close friends before Galindo was transferred to the 2A gallery. During the first interview, Boppre asked Trantham not to include his name in the paperwork because he feared for his safety. After Boppre asked that the interview stop being recorded, he told Trantham that he had helped Galindo pay off a $100 drug debt. He refused to identify who outside the prison helped him pay the debt. Trantham understood that Boppre learned of the debt from Galindo. Trantham was not able to verify the payment by Boppre or substantiate that Galindo owed a drug debt. During both interviews, Boppre focused on attributing Galindo's death to DCS and on his own legal case.

The district court overruled Ramos' request to admit Boppre's statements under the residual hearsay exception. It found that Boppre appeared credible until the interview stopped being recorded. But because Boppre was unavailable by his own choice not to testify, the district court found that admitting his statements would not serve the interests of justice. It also found that Boppre was in police custody when he made the statements, he appeared to be "somewhat of a conspiracy theorist on several levels," he had no motive to avoid his own criminal liability, his statements were not made in response to

leading questions, he spent his second interview complaining about the prison, and he spoke little about anything relevant to Ramos' case.

### (b) Assignments of Error

Ramos assigns that the district court erred in (1) failing to order DCS to transport witnesses material to his defense and (2) denying his request to present those witnesses' statements through the residual hearsay exception.

### (c) Standard of Review

[17] Because of the factors a trial court must weigh in deciding whether to admit evidence under the residual hearsay exception, an appellate court applies an abuse of discretion standard to review hearsay rulings under this exception. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

### (d) Analysis

Ramos assigns that the district court erred in denying his motion to transport witnesses and his alternative motion to present their statements via the residual hearsay exception. He asserts that by rebuffing these efforts to present the statements of both Boppre and Haynes, the district court deprived Ramos of his constitutional right to a meaningful opportunity to present a complete defense. Ramos claims that Boppre and Haynes would have provided a motive for other inmates to kill Galindo, which he contends would have supported his defense that he was misidentified as one of Galindo's attackers.

Whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *State v. Poe*, 276 Neb. 258, 754 N.W.2d 393 (2008). In arguing that the exclusion of Boppre's and Haynes' statements violated his constitutional right to present a complete defense, Ramos relies on *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503

(2006). In *Holmes*, the U.S. Supreme Court held that a defendant's right to present a complete defense is violated when the trial court excludes evidence of third-party guilt based on the application of a rule that is arbitrary or disproportionate to the purposes the rule is designed to serve. Ramos seems to posit that the rules the district court applied were arbitrary or disproportionate to their purposes simply because they resulted in the exclusion of evidence that might have contributed to his defense. But we discern no arbitrary or disproportionate application of exclusionary rules here.

We first take up the motion to transport. In assigning and arguing that the district court erred in overruling it, Ramos overlooks the fact that his motion to transport was sustained. To the extent that Ramos argues that the district court should have forced Boppre and Haynes to testify, he does not explain how the basis for the district court's decision not to order the use of force was arbitrary or disproportionate to its purpose. Nor does he identify how the Constitution would have obligated the district court to compel testimony. To the contrary, we have held that a criminal defendant does not possess an absolute constitutional right to demand the personal attendance of a prisoner witness incarcerated outside the county of the venue of trial. See *State v. Stott*, 243 Neb. 967, 503 N.W.2d 822 (1993), *disapproved on other grounds, State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999). Ramos has illuminated no error concerning the motion to transport.

As for Ramos' assertions that the district court erred in refusing to allow the statements of Boppre and Haynes on residual hearsay grounds, he fares no better. First off, at trial, Ramos abandoned this argument with regard to Haynes, so we need not address Haynes' statements further. And looking to the district court's decision not to admit Boppre's statements to Trantham under the residual hearsay exception, as we demonstrate below, we perceive no abuse of discretion.

[18] Defendants have a constitutional right to a meaningful opportunity to present a complete defense, but this right

is not without evidentiary limits. We have observed that the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. *State v. Clausen*, 307 Neb. 968, 951 N.W.2d 764 (2020). Ramos tacitly concedes that Boppre's statements would be inadmissible hearsay under the standard rules of evidence unless the residual hearsay exception applies.

[19] Under the residual hearsay exception, when the declarant is unavailable as a witness, the trial court has discretion to admit a hearsay statement of that declarant "not specifically covered" by any other hearsay exception. See Neb. Rev. Stat. § 27-804(2)(e) (Reissue 2016). In determining whether a statement is admissible under the residual hearsay exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, the materiality of the statement, the probative importance of the statement, the interests of justice, and whether notice was given to an opponent. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). See, also, § 27-804(2)(e).

[20] In determining admissibility under the residual hearsay exception, a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting the trustworthiness of a statement. A court may compare the declaration to the closest hearsay exception, as well as consider a variety of other factors affecting trustworthiness, such as the nature of the statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement. *Stricklin, supra.*

Considering the factors above, we conclude that the district court did not abuse its discretion in declining to allow Boppre's statements to Trantham into evidence pursuant to the residual hearsay exception. The statements' trustworthiness was diminished because they were not given under oath or subject to cross-examination; were oral, rather than written; and focused on Boppre's complaints about the prison and his own case, rather than on who killed Galindo. Moreover, Boppre refused to have his statement about the drug debt recorded or to reaffirm it in court. And Boppre's statement to Trantham about Galindo's owing a drug debt was double hearsay, because Boppre was relaying to Trantham what Galindo had told him. See, Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024) (defining hearsay); Neb. Rev. Stat. § 27-805 (Reissue 2016) (defining double hearsay). Given that Boppre's hearsay statements were properly excluded, Ramos has failed to demonstrate he was deprived of his right to a meaningful opportunity to present a complete defense. See *Stricklin, supra* (exclusion of hearsay statement under hearsay rule did not violate defendant's right to present complete defense); *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013) (same).

Our conclusion that Ramos was not deprived of his right to present a complete defense is further confirmed by the fact that the district court received other evidence alluding to Galindo's "drug issues" or an unsatisfactory drug transaction as possible motives for the attack. With other evidence about Galindo's drug issues having been presented, any exclusion of Boppre's reference to a paid drug debt would not have violated Ramos' right to present a complete defense.

## IV. CONCLUSION

In light of our reasoning above, we find no merit to Ramos' assignments of error and therefore affirm.

AFFIRMED.

MILLER-LERMAN, J., participating on the briefs.
FREUDENBERG and BERGEVIN, JJ., not participating.