Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/12/2025 08:09 AM CST

IN RE INTEREST OF JEREL S., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
JEREL S., APPELLANT.

___ N.W.3d ___

Filed December 12, 2025.    No. S-25-149.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile delinquency cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.
3. **Criminal Law: Intent: Words and Phrases.** For purposes of the crime of terroristic threats, the intent to terrorize another is an intent to produce intense fear or anxiety in another.
4. **Criminal Law: Evidence: Intent.** The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.
5. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.
6. **Effectiveness of Counsel.** Counsel is not deficient for failing to file a meritless motion.
7. **Effectiveness of Counsel: Proof.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.
8. **Motions for Continuance: Appeal and Error.** A court does not abuse its discretion in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice because of that denial.

Appeal from the Separate Juvenile Court of Lancaster County: Reggie L. Ryder, Judge. Affirmed.

Megan E. McDowell, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, Aynsley Davis, and Kyle Jedlicka, Senior Certified Law Student, for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Papik, J.
After a trial, the juvenile court adjudicated Jerel S. as a juvenile who committed an act which would constitute the crime of terroristic threats. Jerel appeals the adjudication, alleging that the juvenile court erred in finding that he committed an act which would constitute the crime of terroristic threats and in overruling a motion to continue. He also asserts that his counsel was ineffective. Finding no merit to these assignments, we affirm.

## I. BACKGROUND

### 1. Petition Filed

The State commenced these proceedings by filing a petition in the juvenile court. The petition asked the juvenile court to adjudicate Jerel as a juvenile who committed an act which would constitute a felony, pursuant to Neb. Rev. Stat. § 43-247(2) (Cum. Supp. 2024). The felony alleged was terroristic threats as described in Neb. Rev. Stat. § 28-311.01 (Reissue 2016).

The juvenile court appointed the public defender's office to represent Jerel. At the request of Jerel's counsel, the juvenile court ordered a competency evaluation. After receiving a competency evaluation completed by a psychologist, the juvenile

court found that Jerel was competent to stand trial. Shortly thereafter, Jerel entered a denial to the allegations of the petition and the juvenile court scheduled the petition for an adjudication hearing.

## 2. Motions to Disqualify, Continue

On the morning the adjudication hearing was to begin, Jerel's counsel filed a motion to disqualify the juvenile court judge assigned to the case. Jerel claimed disqualification was warranted because the juvenile court judge had previously decided a motion for approval of an emergency placement involving Jerel in another case, brought pursuant to § 43-247(3)(a). Jerel's counsel argued that because the motion for approval of emergency placement contained information about the same incident upon which the allegations in the State's petition were based, the juvenile court judge could not be fair and impartial.

The juvenile court judge overruled the motion to disqualify. The juvenile court judge explained that he would not consider information he had been exposed to in other proceedings involving Jerel in deciding the adjudication petition and that the fact that he had been exposed to such information did not call into question his ability to be fair and impartial. The juvenile court judge also commented on the fact that, although Jerel's counsel had been appointed months earlier, the motion to disqualify was not filed until just prior to the adjudication hearing.

Immediately after the motion to disqualify was overruled, Jerel's counsel moved for a continuance. In support, Jerel's counsel stated, "This is the first time I've met with Jerel in person and he's not had an opportunity to fully go over all the discovery in this case . . . ." Counsel also asked that "certain documentation . . . about the alleged incident be provided to [her] office in order for [her] to review" and appeared to assert that Jerel was entitled to such information under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215

(1963). After the juvenile court asked Jerel's counsel why the documents had not been sought earlier, counsel responded that she had only recently discovered the existence of the case involving Jerel brought pursuant to § 43-247(3)(a).

The juvenile court found that good cause for a continuance was lacking and denied the motion. Then the adjudication hearing began.

## 3. ADJUDICATION HEARING

The State's primary witness at the adjudication hearing was Lanslot Pyne, a foster parent, with whom Jerel had once been temporarily placed. Pyne testified that just after 2 o'clock one morning while Jerel was placed with him, Jerel entered the living room of Pyne's apartment, where Pyne was watching a movie. According to Pyne, Jerel then said that he was "gonna make [the weekend] exciting" for Pyne. Jerel walked to the room where he was staying and initially returned with a lighter. Jerel ignited the lighter and placed it near a tree in Pyne's living room. When Pyne did not react, Jerel returned to his room and retrieved medication, a flashlight, and a knife.

Pyne testified that the agency that placed Jerel in his care had directed that he secure medications and sharp objects and keep them away from Jerel. Following that direction, Pyne had secured knives, medication, and other objects in a safe in his bedroom. When Jerel appeared with the medication, flashlight, and knife, Pyne walked to his room, where he found the safe broken open and several objects, including knives and the medication, missing.

Pyne testified that he then asked Jerel why he took the items, and he recounted Jerel's response:

> He said he was about to make my night exciting. He been thinking about way to get rid of me but he wanted to do something really quick because I'm a big person so he don't wanna do something and then I get to attack him and overpower him, so he rather take me out and do it very quick.

Pyne also testified that Jerel told him he had been researching ways to kill Pyne slowly. When asked if Jerel had specifically said that "he was going to kill [Pyne]," or that "he was going to harm [Pyne]," Pyne answered in the affirmative.

Based on Jerel's statements, Pyne believed that Jerel was about to attack him. Pyne testified that he moved behind a counter and that at that time, Jerel stood on top of the counter and jumped off before "coming at [him] with the knife also."

Pyne testified that at some point after Jerel had come down from the counter, Pyne was able to get both of Jerel's hands behind him and put him "down on the ground in a hold." Pyne then called law enforcement. When Pyne was asked on cross-examination if Jerel suffered any injuries on the night of the incident, he responded, "Not to my knowledge."

The State also called a law enforcement officer who responded to the scene to testify. The officer testified that when he arrived, Jerel told him that he had obtained medication, a knife, and a hammer and that Pyne had assaulted him because he did so.

On cross-examination, Jerel's counsel elicited testimony from the officer that during his interactions with Jerel, Jerel appeared to be in pain, had a scratch on his forearm, and had bleeding cuts on his face. Jerel's counsel also elicited testimony that the officer called an ambulance, which transported Jerel to a hospital, and that when the officer arrived at Pyne's apartment, there was another man in the apartment. During Pyne's testimony, he had denied that there was another person in the apartment.

Jerel testified on his own behalf. He testified that he did not enjoy living with Pyne. He claimed that Pyne threatened him and joked with him by putting his hands around Jerel's throat. According to Jerel, he had requested a different placement from his caseworker prior to the confrontation at issue.

In his testimony, Jerel offered an account of the confrontation that differed from Pyne's. He testified that he found his medication in an unlocked suitcase, along with hammers,

flashlights, lighters, and other "stuff like that." He grabbed a medication pack, the knife, and a flashlight, and he showed them to Pyne. He testified that he did so because he "was hoping that through that [Pyne] would not want to keep [Jerel] in his home any longer and remove [him] sooner."

Jerel testified that he did not go after Pyne, but that Pyne began chasing him. Jerel testified that he jumped onto the counter to avoid Pyne and that he felt threatened while on the counter. Jerel testified that after he jumped off the counter, Pyne's friend, who Jerel said was in the apartment during the entire altercation, grabbed him and then Pyne pinned him to the ground. According to Jerel, he received scratch marks and bruises from Pyne's contact with him. Jerel denied making any verbal threats to Pyne and denied intending to harm Pyne.

## 4. ADJUDICATION

The juvenile court adjudicated Jerel as a juvenile described in § 43-247(2), finding beyond a reasonable doubt that Jerel committed an act which would constitute making terroristic threats. In explaining its ruling, the juvenile court stated that it found Pyne "highly credible." In contrast, the juvenile court stated that it found Jerel's account of the incident "not believable."

Jerel filed a timely appeal of the adjudication.

## II. ASSIGNMENTS OF ERROR

Represented by different counsel on appeal, Jerel assigns three errors. Two assignments pertain to the juvenile court. He asserts that the juvenile court erred by finding that the State proved its allegations beyond a reasonable doubt and by overruling his motion to continue.

Jerel also claims that he received ineffective assistance from his trial counsel. Here, he assigns that "trial counsel provided ineffective assistance of counsel throughout the proceedings, including at trial, . . . which violated his due process

rights and which precluded him from fundamental fairness in the process to which he was entitled."

## III. STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile delinquency cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. See *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

This court has not directly addressed what standard of review applies to the denial of a continuance in a juvenile delinquency case. In criminal and civil cases, however, the decision of whether to grant a continuance is reviewed for abuse of discretion. See *State v. Ramos*, 319 Neb. 511, 23 N.W.3d 640 (2025) (criminal), and *Noel v. Pathology Med. Servs., ante* p. 92, 26 N.W.3d 196 (2025) (civil). We apply that same standard here.

## IV. ANALYSIS

### 1. STATE'S BURDEN OF PROOF

We begin our analysis with Jerel's argument that the juvenile court erred by finding that the State carried its burden of proof. In this case, for Jerel to be adjudicated under § 43-247(2), the State was obligated to prove beyond a reasonable doubt that he committed an act which would constitute a felony under the laws of this state. See *In re Interest of Zoie H.*, 304 Neb. 868, 937 N.W.2d 801 (2020).

[3] As we have noted above, the State alleged that Jerel committed an act which would constitute the Class IIIA felony of terroristic threats described in § 28-311.01. Relevant here, § 28-311.01(1) provides that a person commits terroristic threats if he or she "threatens to commit any crime of violence . . . [w]ith the intent to terrorize another." For purposes of the crime of terroristic threats, the intent to terrorize another is an

intent to produce intense fear or anxiety in another. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024).

An analysis of whether the State carried its burden to show that Jerel committed an act which would constitute terroristic threats must begin with the fact that the State introduced evidence, through Pyne's testimony, that Jerel, while holding a knife, said that he had been thinking about ways to get rid of Pyne and researching ways to kill him. Pyne also testified that Jerel told him he was going to kill him and harm him. Jerel does not contest that such statements would constitute "threats . . . to commit [a] crime of violence" for purposes of § 28-311.01(1). Instead, Jerel primarily argues that his conflicting account of the confrontation supplies reasonable doubt that he, in fact, made such statements. To this, Jerel adds that the juvenile court should have believed his testimony rather than Pyne's because he was more credible. In support, he points out that the law enforcement officer corroborated his testimony that there was another man present in the apartment during the incident and that Jerel suffered injuries. Meanwhile, Pyne denied the presence of another man and disclaimed any knowledge of Jerel's injuries.

Jerel essentially asks us to reweigh his account of the incident alongside Pyne's. But although our review in this case is de novo, there is a caveat. When confronted with conflicting testimony in juvenile delinquency cases, we may, notwithstanding our de novo standard of review, give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. See *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022). We find it appropriate to do so here. The juvenile court had the opportunity to observe the testimony of Pyne and Jerel firsthand; we, on the other hand, can only review a cold appellate record. And while Jerel points to some issues on which his testimony was arguably corroborated and Pyne's was not, those issues are collateral to the primary question before the juvenile court—whether Jerel made the alleged threats or not.

The juvenile court considered the conflicting testimony and found beyond a reasonable doubt that he had. We are not in a position to say that was erroneous.

[4] In addition to asking us to credit his testimony rather than Pyne's, Jerel submits there was inadequate proof that he intended to terrorize Pyne. Although there was perhaps no direct evidence of Jerel's intent, we have recognized that the intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *State v. Clark, supra*. Here, Pyne's testimony that Jerel discussed killing him while holding a knife would certainly allow one to infer that Jerel intended to terrorize Pyne. That testimony, found credible by the juvenile court, leaves us unable to conclude that the State failed to prove Jerel acted with the requisite intent.

Jerel's arguments that the State failed to carry its burden of proof are meritless.

## 2. Ineffective Assistance
### of Counsel

We next address Jerel's assignment of error claiming that he received ineffective assistance of counsel. This court does not appear to have previously held that a juvenile has a right to effective assistance of counsel in a juvenile delinquency proceeding. However, in *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), the U.S. Supreme Court held that the 14th Amendment right to due process guarantees a juvenile offender a right to counsel in a delinquency adjudication in which the juvenile's freedom could be curtailed. See, also, *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018). Many other courts have concluded that the right to counsel in juvenile delinquency proceedings described in *In re Gault* includes the right to effective counsel. See, e.g., *In re Johnathan T.*, 2022 IL 127222, 193 N.E.3d 1240, 456 Ill. Dec. 832 (2022); *JP v. State*, 514 P.3d 785 (Wyo. 2022);

*D.C.M. v. Pemiscot County Juvenile Office*, 578 S.W.3d 776 (Mo. 2019); *In re Parris W.*, 363 Md. 717, 770 A.2d 202 (2001); *In re K.J.O.*, 27 S.W.3d 340 (Tex. App. 2000). For purposes of this opinion, we assume that Jerel had such a right to effective counsel in this adjudication proceeding.

But our assumption that Jerel had a right to effective assistance of counsel in this adjudication proceeding raises several questions about how claims of ineffective assistance in juvenile delinquency proceedings should be resolved. These questions arise because while there are well-established rules and procedures governing claims of ineffective assistance in criminal cases, some of those rules and procedures do not map neatly onto juvenile delinquency cases. We discuss each of these questions in the sections below before ultimately analyzing Jerel's ineffective assistance of counsel claim.

### (a) Adequate Assignment of Error?

The first question raised by Jerel's ineffective assistance assignment of error is whether it assigns the allegedly deficient conduct of counsel with adequate specificity. When a criminal defendant asserts ineffective assistance of counsel on direct appeal, the assignment of error, standing alone, must specifically allege what conduct constituted deficient performance. See *State v. Rupp, ante* p. 502, ___ N.W.3d ___ (2025).

If this were a criminal case, Jerel's assignment of error would clearly fail to adequately assign deficient performance. Jerel's assignment of error, quoted above, generally asserts that counsel was ineffective throughout the proceedings. Any detail about how his counsel was ineffective is set forth in the argument section of the brief rather than in the assignment of error itself. In an opinion released today, we explain that in a criminal case, a party cannot comply with the specificity requirement by making a general assignment of ineffective assistance and setting forth the specifics of the allegedly deficient performance in the argument section of the brief. See *id.*

This, however, is not a criminal proceeding. In addition, the State made no argument in this case that the specificity requirement for assigning ineffective assistance of counsel should extend to this juvenile delinquency proceeding. For purposes of this case, we therefore assume without deciding that the specificity requirement does not apply and will consider Jerel's assignment of ineffective assistance of counsel notwithstanding its general nature.

### (b) Resolution Based on Existing Record?

Another question posed by the assertion of ineffective assistance of counsel in a juvenile case is whether such a claim should be resolved based solely on the existing record. In criminal direct appeals, we routinely decline to rule on claims of ineffective assistance because the record is insufficient to assess them. See *State v. Filholm*, 287 Neb. 763, 768-69, 848 N.W.2d 571, 577 (2014) ("[w]e have held in countless cases that the record on direct appeal was insufficient for assessing ineffective assistance of counsel claims"). When the record on direct appeal is found to be insufficient to resolve a claim of ineffective assistance in a criminal case, the defendant can raise that ineffective assistance claim in a subsequent motion for postconviction relief. See, e.g., *State v. Nolan*, 292 Neb. 118, 870 N.W.2d 806 (2015) (finding defendant was entitled to evidentiary hearing in postconviction proceeding on claims asserted in direct appeal but on which record was insufficient to resolve). But see *State v. Stelly*, 304 Neb. 33, 64, 932 N.W.2d 857, 879-80 (2019) ("just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim").

We, however, are aware of no procedure similar to a motion for postconviction relief through which a juvenile could raise

a claim that counsel in a delinquency adjudication was ineffective. One might then wonder whether we must attempt to resolve Jerel's claims of ineffective assistance based solely on the trial record or whether we can defer ruling on those claims as we might in a criminal case.

We acknowledge that in some states, when an appellate court determines that the record in a direct appeal is insufficient to resolve a claim of ineffective assistance in a juvenile delinquency proceeding, the court will remand the matter to the court in which the adjudication hearing took place for an evidentiary hearing. See, e.g., *D.C.M. v. Pemiscot County Juvenile Office*, 578 S.W.3d 776 (Mo. 2019). We are not aware of any Nebraska statute, however, that would authorize us to order or the juvenile court to conduct such a hearing. Statutory authorization for such a hearing is particularly salient in this context given our recognition that a juvenile court, as a statutorily created court of limited jurisdiction, has only the authority which the statutes confer upon it. See, e.g., *In re Interest of Jordon B.*, 312 Neb. 827, 981 N.W.2d 242 (2022).

In any event, Jerel has not requested that his claims of ineffective assistance be resolved on anything other than the existing record. Accordingly, we will resolve Jerel's claims of ineffective assistance based on the record before us. If that record does not establish ineffective assistance, Jerel will not be entitled to relief.

### (c) What Standard to Apply?

Before we can analyze Jerel's ineffective assistance of counsel claims, one more preliminary, but important, question lingers: What standard ought to be applied to analyze the claims? On this question, the parties each offer a different proposal.

The State argues that we should apply the same two-prong inquiry first set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), that is applied when assessing ineffective assistance of counsel claims in

criminal proceedings. Jerel, on the other hand, urges us to apply a standard applied by the Indiana Supreme Court in *A.M. v. State*, 134 N.E.3d 361 (Ind. 2019), a case in which a juvenile alleged that his counsel was ineffective in a disposition modification proceeding. In that context, the Indiana Supreme Court declined to evaluate the claim of ineffective assistance under *Strickland* and instead evaluated the claim by asking "whether the lawyer's overall performance was so defective that the . . . court cannot say with confidence that the juvenile court imposed a disposition modification consistent with the best interests of the child." *A.M. v. State*, 134 N.E.3d at 368 (internal quotation marks omitted).

We have doubts that the standard applied by the Indiana Supreme Court in *A.M.* is the appropriate standard to apply when it is asserted that counsel provided ineffective assistance in a juvenile delinquency adjudication proceeding. The Indiana Supreme Court applied that standard when it was alleged that counsel was ineffective in a *disposition modification proceeding*, and that court recently declined an opportunity to extend the same standard to ineffective assistance claims arising out of the adjudicative phase of juvenile delinquency proceedings. See *J.M. v. State*, 264 N.E.3d 1197 (Ind. 2025).

That said, we believe there are also reasons to question whether *Strickland* is the appropriate test for analyzing claims that counsel was ineffective in a juvenile delinquency adjudication proceeding. Although it appears most courts apply *Strickland* to such claims, see Barbara Fedders, *Losing Hold of the Guiding Hand: Ineffective Assistance of Counsel in Juvenile Delinquency Representation*, 14 Lewis & Clark L. Rev. 771 (2010), *Strickland* held that its two-prong test should be applied to determine whether a criminal defendant's Sixth Amendment right to counsel was violated. But the Sixth Amendment applies to criminal prosecutions. See U.S. Const. amend. VI ("[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence").

And juvenile delinquency proceedings are not criminal prosecutions. *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018). Rights to counsel in a juvenile delinquency proceeding have a different constitutional source—the 14th Amendment right to due process. See *In re Interest of Jordan B., supra*.

In a concurring opinion in *A.M.*, one judge of the Indiana Supreme Court contended that because the right to counsel in a juvenile delinquency proceeding is a due process right, claims of ineffective assistance in such proceedings should be analyzed not under *Strickland* or the test set forth by the majority in *A.M.*, but under a "minimal procedural-due-process standard" of "fundamental fairness." *A.M. v. State*, 134 N.E.3d at 369 (Slaughter, J., concurring). The author of the concurrence asserted that under this standard, the juvenile would be entitled to relief only if the lawyer "abandoned the case and prevented the client from being heard." *Id.* (internal quotation marks omitted).

In the end, we determine it is not necessary to resolve in this case whether Jerel's claims are appropriately resolved under *Strickland*, under the alternative proposed by Jerel, or under a minimal procedural due process standard focused solely on fundamental fairness. As we will explain now, under any of those standards, we find no ineffective assistance.

### (d) Analysis of Ineffective Assistance Claims

Jerel argues that his counsel was ineffective in several ways. He first argues that his counsel was ineffective in not moving to disqualify the juvenile court judge earlier in the proceedings. He next claims his counsel was ineffective in not requesting and obtaining additional information, more specifically documentation from the case involving Jerel brought pursuant to § 43-247(3)(a), as well as information provided to the psychologist for Jerel's competency evaluation. Jerel also alleges his counsel was ineffective in failing to

meet with him in person to review the evidence that would be presented against him and in failing to present defenses to the petition. He mentions lack of capacity as a defense that was "potentially" available. Brief for appellant at 22.

[5] Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), Jerel has not shown ineffective assistance. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Hagens, ante* p. 65, 26 N.W.3d 174 (2025). With respect to some actions of his counsel, Jerel cannot show deficient performance, and with respect to others, he cannot show prejudice.

[6] Jerel's claim that his counsel should have moved to disqualify the juvenile court judge earlier fails the deficient performance prong. While Jerel's brief devotes several paragraphs to arguing why his trial counsel could have made the motion to disqualify earlier, it offers no real argument as to why such a motion would have been successful. A litigant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. See *Buttercase v. Davis*, 313 Neb. 1, 982 N.W.2d 240 (2022), *modified on denial of rehearing* 313 Neb. 587, 985 N.W.2d 588 (2023). The fact that the juvenile court judge had previously been exposed, in another case, to information regarding the incident at issue in this case is hardly sufficient to overcome that presumption. A motion to disqualify on this basis alone would have failed, regardless of when it was filed. And counsel is not deficient for failing to file a meritless motion. *State v. Haas*, 317 Neb. 919, 12 N.W.3d 787 (2024).

[7] Jerel's other allegations of ineffective assistance of counsel fail the prejudice prong of *Strickland*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the

proceeding would have been different. *State v. Thomas*, 311 Neb. 989, 977 N.W.2d 258 (2022). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Even if Jerel could establish that his counsel was deficient in any of the ways alleged, he cannot show any reasonable probability that, but for those alleged deficiencies, the adjudication hearing would have ended in a different result. While Jerel complains that his counsel should have obtained more documentation, he offers no suggestion as to what any of this documentation would have shown. While he says that his counsel should have met with him in person before the day of the adjudication hearing, he does not tell us how such a meeting would have affected the evidence presented at trial. And while he says that his counsel should have put on evidence of defenses including, "potentially," a defense based on capacity, he points to no information that would have allowed that or any other defense to succeed. See brief for appellant at 22.

Jerel's ineffective assistance claims would also fail under the standard he asks us to apply from the Indiana Supreme Court's opinion in *A.M. v. State*, 134 N.E.3d 361 (Ind. 2019). While Jerel argues that his trial counsel should have done various things differently, the Indiana Supreme Court stated that under the standard it articulated, courts should focus not "on what the child's lawyer might or might not have done to better represent the child" but on whether the hearing was fundamentally fair and whether the outcome was appropriate considering the child's best interests. See *A.M. v. State*, 34 N.E.3d at 368.

On the record before us, we cannot conclude the hearing was fundamentally unfair or resulted in an outcome inconsistent with Jerel's best interests. Although Jerel claims there were things his trial counsel could or should have done differently, it is not as though his trial counsel did nothing at all or abandoned the case. Counsel cross-examined the State's

witnesses and allowed Jerel to give his account of the incident at issue through his direct testimony. Counsel was able to use that testimony to develop an argument that the events at issue did not occur as Pyne testified. And although the juvenile court was ultimately not persuaded by this argument, we find no basis to conclude the adjudication hearing was fundamentally unfair or resulted in an outcome that was inconsistent with Jerel's best interests. And because Jerel's counsel did not abandon the case or prevent Jerel from being heard, his claims would also fail under a minimal procedural due process standard focused solely on fundamental fairness.

### 3. Motion to Continue

Finally, we turn to Jerel's contention that the juvenile court erred by denying his motion to continue. Jerel's arguments that the juvenile court should have continued the case rely on much of the same material that formed the basis of his ineffective assistance of counsel claims. Jerel argues that the juvenile court should have granted his request for a continuance because his trial counsel informed the juvenile court that she had not met with Jerel in person before the day of the adjudication hearing, had not gone over all the evidence with him, and had not obtained evidence that she claimed might be relevant to the case. These comments, Jerel argues, demonstrated that counsel was not prepared to adequately represent him and were grounds for a continuance.

[8] We find no reversible error. A court does not abuse its discretion in denying a continuance unless it clearly appears that the party seeking the continuance suffered prejudice because of that denial. *State v. Ramos*, 319 Neb. 511, 23 N.W.3d 640 (2025). As previewed by our discussion of Jerel's ineffective assistance of counsel claims, there is no basis on which we could conclude that the adjudication hearing would have ended differently had a continuance been granted so that Jerel's counsel could meet with him personally or obtain additional documentation. We do not know what would have

transpired differently had Jerel's counsel met with him in person, and we do not know what documents might have been obtained. Furthermore, Jerel had the benefit of a contested adjudication hearing at which his counsel cross-examined the State's witnesses, adduced testimony from Jerel, and presented an argument that he did not commit an act which would constitute terroristic threats. Jerel cannot show that he suffered prejudice from the denial of the continuance.

## V. CONCLUSION

For the reasons above, we find no merit to Jerel's assignments of error and therefore affirm.

AFFIRMED.